Theodore MARAS, Appellant

v.

**COMMONWEALTH of Kentucky, Appellee**

**2013–SC–000267–DG**

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

Counsel for Appellant: Bruce P. Hackett, Chief Appellate Public Defender, Daniel T. Goyette, Louisville Metro Public Defender.

Counsel for Appellee: Jack Conway, Attorney General of Kentucky, William Robert Long, Jr., Assistant Attorney General.

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

As recently as three years ago, this Court reaffirmed our commitment to the historic rule prohibiting the use of post-trial juror statements to impeach a facially valid verdict—a rule, as we said in *Commonwealth v. Abnee*, that is "firmly rooted in the early years of Kentucky jurisprudence." [1]

Relying upon post-trial comments attributed to jurors implying that the jury had not agreed unanimously on all of the statutory elements of the crime of first-degree stalking—one of the crimes of which he had just been convicted—Theodore Maras moved the trial court for judgment of acquittal notwithstanding the verdict or a new trial. The trial court denied the motion and entered judgment imposing sentence. The Court of Appeals affirmed the judgment. We granted discretionary review and now affirm the Court of Appeals because the record does not warrant departure from the historic rule.

---

1. 375 S.W.3d 49, 52 (Ky. 2012) (citing *Johnson v. Davenport*, 26 Ky. 390, 393 (1830)).

## I. FACTUAL AND PROCEDURAL BACKGROUND.

A romantic relationship developed between Christina Potter and Maras, and they began living together. After a few months together, Potter filed for an emergency protective order (EPO) against Maras, alleging domestic violence. Potter soon dropped the action after discussing the matter with Maras and some of his family members.

The next year, Potter sought a second EPO. And this time, Potter followed through, obtaining a domestic violence order (DVO) against Maras. The DVO mandated Maras have no contact with Potter and refrain from possessing any firearm for a period of three years. The DVO also required Maras to stay at least 600 feet from Potter and her family members.

Despite the DVO's clear prohibition, Maras continued to contact Potter. He made numerous phone calls to her and sent her several text messages. At one point, Maras even threatened to commit suicide over the couple's breakup. Maras's behavior became increasingly unnerving.

In the weeks leading up to his arrest for violating the DVO, Maras left a note on Potter's door detailing how much he missed her and how distressed he was over her inventing excuses for not talking to him. With the note, Maras left a collection of Potter's personal items and, strangely enough, a shotgun barrel. Maras waited outside in his truck but left before the police arrived.

On another occasion, as Potter was leaving for work, she discovered an intoxicated—and armed—Maras sitting in his truck in front of her home. Maras told Potter he came to say goodbye. Potter asked what Maras meant by this, and he replied that she knew what he was talking about. Potter asked Maras to give her the gun, which he did, and then told Maras to go home, sober up, and leave her alone.

While at work that day, Maras left several notes on Potter's car and was waiting outside when she left work. Potter contacted the police when she got home. The police took possession of the firearm Maras had that morning—a double-barrel shotgun that had been cut down and the barrel sawed off. The firearm was loaded with two shells.

A few days later, Maras again violated his DVO when he attempted to contact Potter outside her daughter's home. Maras was eventually arrested for violating the DVO and charged with first-degree stalking, violation of a protective order, being a felon in possession of a firearm, and being a first-degree persistent felony offender (PFO 1).

During its deliberation at trial, the jury apparently sent a note to the trial court asking for clarification about the meaning or interpretation of the jury instructions.[2] The trial court discussed the jury's question with both the Commonwealth and Maras's counsel and returned a note advising the jury no clarification could be provided.

The jury convicted Maras of all charges.[3] For the violation of a protective

---

2. We say *apparently* because the discussion was not recorded in the record, outside of being recounted in Maras's motion for a new trial following the entry of his sentence. In any event, that the discussion happened is uncontested.

3. The charge of being a felon in possession of a firearm was severed. A few months after the trial now under review, Maras pleaded guilty to the firearm charge and was sentenced to five years' imprisonment to be served concurrently with the sentences imposed for stalking and violation of a protec-

order, a misdemeanor, the jury recommended a sentence of nine months' confinement. For the stalking conviction, the jury recommended a sentence of five years' imprisonment.

Following the jurors' deliberation but before they left the courtroom, the trial court instructed the jurors to return to the jury room and informed them that they would be finally excused following a brief discussion. As to the ensuing discussion with these former jurors, the judge later notified both Maras's counsel, as well as the Commonwealth's attorney, that she had spoken to the jurors about the question they had posed to her during deliberation regarding the instructions. Days later, and based on the trial judge's disclosure, Maras filed a motion for judgment notwithstanding the verdict (JNOV), seeking a new trial. Maras alleged that some members of the jury had, after they had been discharged, informed the trial court that they could not unanimously agree on whether Potter feared for herself. The jurors apparently acknowledged, however, that they could unanimously agree that Potter, at the very least, feared for others, *i.e.*, her boyfriend and daughter. Allegedly, this was the basis for the jury's conviction of Maras.

## II. ANALYSIS.

■ From the outset, we should be clear about what this case involves and what it does not. This case *does* involve a review of whether post-verdict juror statements can be used to overturn a verdict. But this case *does not*—as Maras attempts

to argue—require this Court to resolve his main argument that he was convicted of a crime nonexistent under the Kentucky Penal Code. A detailed review of the statutory elements of first-degree stalking is unnecessary to resolve this case on discretionary review.

■ Our modern expression of the time-honored principle we recently reaffirmed in *Abnee* is found in Kentucky Rules of Criminal Procedure (RCr) 10.04, which states that "[a] juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot." The sound policy reasons supporting the rule are self-evident. Again, in *Abnee*, we noted:

> The rule serves several important purposes. It aids in protecting the sanctity and finality of judgments based upon jury verdicts. It promotes open and frank discussion among the jurors during deliberations. By barring the use of a juror's testimony to attack a verdict, the rule protects individuals who have served on juries from potentially corruptive influences that, in the hope of altering a verdict, might otherwise be brought to bear against a former juror.[4]

But the rule is not ironclad. Over time, we have acknowledged limited circumstances where the clear text of the rule must yield to constitutional demands. These limited circumstances can be summed up rather simply: juror testimony is permitted when it "concern[s] any overt acts of misconduct by which extraneous and potentially prejudicial information is presented to the jury[.]"[5]

tive order. As for Maras's PFO–1 charge, the Commonwealth admitted before trial that Maras could not be found guilty of that offense so the charge was dismissed.

**4.** *Id.* at 53.

.**5.** *Id.* at 54. The Supreme Court, some two days before oral argument in the instant case, noted perhaps an additional situation where juror testimony is allowed. In *Warger v. Shauers,* —— U.S. ——, 135 S.Ct. 521, 190 L.Ed.2d 422 (2014), the Court pointed out that "[t]here may be cases of juror bias so

Reviewing the record in the case before us, we cannot say with certainty what any of the former jurors actually said or intended to say about their verdict when they conversed with the trial judge at that post-trial meeting in the jury room. It is entirely plausible that the jurors who spoke meant exactly what Maras now alleges: that the jury only found him guilty based on a "fear for others" theory of the crime. If this were the case, then Maras's conviction would at least arguably be a misapplication of the law.

 But the mere possibility that a jury may have misapplied the law is not sufficient to warrant setting aside a verdict. Maras's attack on the verdict here can be accurately characterized as nothing more than "an attempt to expose the jury's collective mental process to judicial scrutiny."[6] Notably, there is no claim that the trial court provided inaccurate jury instructions; no claim that evidence of Potter's self-fear was absent[7]; and no claim

that the jury was tainted by some overt act of misconduct. In other words, Maras presents no challenge to the facial validity of the verdict: the Commonwealth presented more than a "mere scintilla"[8] of evidence for the case to be presented to the jury; and the jury convicted Maras of first-degree stalking, obviously a crime within the Kentucky Penal Code. In sum, Maras's challenge is "the one form of attack on a verdict that has always been forbidden in Anglo–American criminal law": an attempt "to probe [the jury's] process of deliberation and find out how and why the jury reached its verdict."[9]

 The necessary side effect of our prohibition on examining[10] the jury's deliberation methodology is that "convictions must stand despite the presence of plausible suspicion that the jury's mental process was ill-conceived."[11] It is important to remember that juries are a "group of laymen" placed between the accuser and the accused to "prevent oppression by the

---

extreme that, almost by definition, the jury trial right has been abridged. If and when such a case arises, the Court can consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Id.* at 529 n. 3. Our *Abnee* opinion most likely includes the set of facts described by the Supreme Court in *Warger*, regardless, we need not deal with it today because Maras does not raise claims of juror bias.

6. *United States v. D'Angelo*, 598 F.2d 1002, 1003 (5th Cir. 1979).

7. Evidence of Potter's own fear of Maras was admitted at trial. Of course, one way of impeaching a verdict is to argue the evidence was insufficient to submit the case to the jury in the first instance. Maras does not—and cannot—argue this. In point of fact, Maras admitted at oral argument that a directed verdict would have been inappropriate in light of the evidence introduced by the Commonwealth at trial.

8. *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

9. *D'Angelo*, 598 F.2d at 1004.

10. Maras makes the meritless argument that *examine*, as used in RCr 10.04, does not apply to what happened here—specifically, the instant jurors were not examined because they were not interviewed or interrogated by the parties but, rather, the trial judge. For support, Maras cites the highly formal definition of *examine*: "to subject to legal inquisition; put to question in regard to conduct or to knowledge of facts; interrogate[.]" Dictionary.reference.com/browse/examine?s=t. Conveniently, Maras overlooks any other definition, such as simply "to inquire into or investigate[.]" *Id.* In any event, *examine* does not carry with it a requirement of legal process. It means, instead, exactly what it says: inquiring into the decision–making process of the jury is not sufficient to impeach a verdict.

11. *D'Angelo*, 598 F.2d at 1005.

Government." [12] This role is a sacred one in criminal cases, made clear in this Commonwealth by its designation as such in our constitution. In hopes of protecting the jural institution, we must "trust[ ] that a jury will understand and follow the law as instructed, and [we must] indulge[ ] the jury when apparent gaps in understanding or logic later surface." [13] To do otherwise would be to undermine the entire enterprise: jury verdicts either would be the court's verdict or "permitted to stand only by the court's leave." [14] Accordingly, we are charged with refraining from entertaining suspicion or engaging in conjecture that the jury verdict may have resulted from compromise, mistake, or even carelessness—after all, "[j]uries may indulge in precisely such motive or vagaries" [15] and "verdicts cannot be upset by speculation or inquiry into such matters." [16]

█ Here, rather than constructing a solid attack on his conviction, Maras is able to build nothing more than a house of cards. RCr 10.04 prohibits the use of juror statements in the manner Maras posits here. Without more, *e.g.*, indication of overt influence, a facially valid jury verdict will not be upset based on post-trial juror statements. The Court of Appeals correctly held that the trial court did not abuse its discretion in denying Maras's motion.

### III. CONCLUSION.

For the foregoing reasons, we affirm the opinion of the Court of Appeals upholding the judgment. Maras presents nothing more than speculation and conjecture, which are wholly insufficient to move this Court to entertain setting aside a jury verdict.

All sitting. All concur.

**12.** *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

**13.** *D'Angelo*, 598 F.2d at 1005.

**14.** *Id.*

**15.** *United States v. Dotterweich*, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

**16.** *Dunn v. United States*, 284 U.S. 390, 394, 52 S.Ct. 189, 76 L.Ed. 356 (1932).