RENDERED: FEBRUARY 14, 2019

TO BE PUBLISHED

## Supreme Court of Kentucky

2018-SC-000019-MR

PERRY JACK PROBUS JR.                  APPELLANT

           ON APPEAL FROM OLDHAM CIRCUIT COURT
V.             HONORABLE KAREN A. CONRAD, JUDGE
                    NO. 15-CR-00098

COMMONWEALTH OF KENTUCKY            APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING</u>**

A circuit court jury convicted Perry Jack Probus Jr. of various crimes for his role as a complicitor in a home invasion. For these crimes, he received an enhanced sentence of forty-five years' imprisonment as a first-degree persistent felony offender. Probus appeals the resulting judgment as a matter of right. He raises several issues for our review, including a matter of first impression in this state: whether the conviction of the principal actor to a lesser offense based on a plea agreement precludes the prosecutor from pursuing a greater offense against the complicitor at trial. We conclude that the principal's guilty plea to a lesser offense does not preclude prosecution of the complicitor for a greater offense. Thus, finding no merit to this and the other arguments Probus raised in this appeal, we affirm the trial court's judgment.

# I. BACKGROUND.

Tammy Robinson was working as a nanny when at mid-morning she answered a knock at the door. There stood a man later identified as Solomon Slinker. He was dressed as a deliveryman and claimed he had a package for the homeowner, "Billy." Slinker asked Robinson for a signature, so Robinson went to find a pen.

As Robinson returned to the door, she found Slinker inside the house pointing a gun at her. After a brief struggle, Slinker subdued Robinson. Robinson told Slinker to take whatever he wanted but not to harm Billy's two children, who were also in the house at the time. Slinker tied Robinson's hands together with zip-ties, but she broke free when one of the children ran to her. Slinker then pushed Robinson and the child into the bathroom and followed them inside the bathroom. While inside the bathroom, Robinson heard drilling and banging coming from inside the house, prompting her to conclude that another person had entered the house and was making those noises.

Eventually, Slinker left the bathroom, and Robinson retrieved her cell phone and called for help. Robinson did not encounter any other intruder after Slinker left the bathroom. Sergeant Ray Whitehill arrived, and his investigation revealed, among other things of interest, a blue U-Haul blanket covering a safe in the garage. Sergeant Whitehill later found out that the safe had been moved to the garage from the master bedroom.

Sergeant Whitehill then spoke with Robinson, Billy, and some neighbors. Of note, one of the neighbors recalled seeing a white Ford F-150 in Billy's

2

driveway. After speaking with these individuals, Sergeant Whitehill received a call from Kathy Hatcher.

Hatcher asked if there had been a home invasion "the other night" in the neighborhood. Hatcher stated that her son, Slinker, may have been involved. Hatcher told Sergeant Whitehill that her husband overheard Slinker's phone conversation in which Slinker stated that he and "P.J." had "made the news" but were unable to get the safe. Hatcher's husband identified "P.J." as the defendant in this case, Perry Jack Probus.

Sergeant Whitehill arrested Slinker on an outstanding warrant for an unrelated crime. Sergeant Whitehill took that opportunity to interview Slinker about the home invasion, and Slinker admitted to the crime and implicated Probus. Slinker gave an account of the events surrounding the home invasion.

Slinker and Probus had become housemates earlier in the month. Slinker learned of a failed invasion of Billy's home that Probus and an individual named Steven Vaughan had attempted. Slinker offered to help Probus make another attempt at the home invasion.

Probus showed Slinker Robinson's Facebook picture and told Slinker that Robinson would be the one answering the front door of Billy's residence. Probus apparently told Slinker that Billy would pay them $3500 to take a safe from the house or $1000 to retrieve paperwork out of the safe if they could not take the safe.[1]

---

[1] Although initially suspected, police eventually stopped pursuing Billy as a suspect.

The evening before the home invasion, Probus sent Slinker a text telling him to be ready the following morning. Later, on the morning of the invasion, Probus texted Slinker, telling him to get ready. Slinker dressed as a UPS deliveryman. Probus brought the white F-150 truck to be used in the home invasion, while Slinker brought zip-ties, a cellphone jammer, walkie-talkies, a clipboard, and a box. At the suggestion of Probus, Slinker also brought a BB gun with the orange tip removed.

Probus and Slinker arrived at Billy's residence and the events with Robinson transpired as described above. As Slinker guarded Robinson and the child inside the bathroom, Probus signaled for Slinker to exit the house and return to the truck. Slinker saw that Probus had not retrieved the safe and asked Probus about it. Probus responded that the safe was too heavy but both would still be paid.

Upon arriving at Probus's house, Probus told Slinker to leave and lay low for a while. When Slinker asked Probus about the money, Probus told Slinker that he had retrieved some laptops and purses that they could sell and split the proceeds.

Because of Slinker's confession, Sergeant Whitehill obtained a search warrant for Probus's residence where he collected several Coach purses, (identified as belonging to Billy's girlfriend who resided at Billy's home), walkie-talkies, a cell phone jammer, two U-Haul blankets, and other various items of interest.

4

Probus was indicted. After two mistrials, at Probus's third trial, the jury convicted Probus of complicity to first-degree robbery, complicity to first-degree burglary, two counts of complicity to first-degree wanton endangerment, and of being a persistent felony offender, recommending a total sentence of 45 years' imprisonment, which the trial court imposed.

## II. ANALYSIS.

### A. The trial court correctly denied Probus's motion for a directed verdict.

Probus's first allegation of error is that the trial court should have granted his motions for directed verdict on the complicity to first-degree robbery, complicity to first-degree burglary, and complicity to first-degree wanton endangerment charges. Specifically, Probus argues that the Commonwealth offered insufficient evidence that the gun with which Slinker threatened Robinson constituted a "deadly weapon" or "dangerous instrument," the necessary findings the jury had to make to find Probus guilty of those crimes under the jury instructions. That this issue is preserved for our review is undisputed.

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for the jury to find guilt, only then is the defendant entitled to a directed verdict of acquittal."[2] Probus asks this Court to find that the jury's finding of guilt on Probus's charges was clearly unreasonable, specifically, because there was insufficient evidence to

---

[2] *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991) (citing *Commonwealth v. Sawhill,* 660 S.W.2d 3, 4–5 (Ky. 1983)).

believe the gun Slinker used to threaten Robinson during the commission of the crime was a "deadly weapon" or "dangerous instrument." We decline to find so.

Under the jury instructions, for the jury to have found Probus guilty, it needed to find, among other elements, that the commission of the crimes involved a "dangerous instrument," for complicity to first-degree robbery, and a "deadly weapon," for complicity to first-degree burglary and first-degree wanton endangerment. Probus admits that this Court in *Johnson v. Commonwealth* observed that "a jury could reasonably determine that a pellet or BB gun was a deadly weapon (i.e. a type of weapon from which a shot could cause death or serious physical injury) in light of history of serious physical injuries caused by BB or pellet guns."[3] Probus argues here that the evidence adduced at trial as to the type of gun brandished during the commission of the crime was insufficient for a jury to find that the gun constituted a "dangerous instrument" and "deadly weapon." But Probus's argument is meritless.

The gun brandished by Slinker was referred to at trial interchangeably as a "toy gun," "fake gun," "BB gun," "toy BB gun," and "airsoft gun." Slinker characterized the gun at issue most often as a "BB gun." Probus's argument incorrectly assumes that characterization of the gun as a "toy," "fake," or any other less-dangerous-sounding characterization of the gun means that the jury could have not put those characterizations on the same plane as a characterization of the gun as a "BB gun," which this Court has already

---

[3] 327 S.W.3d 501, 507 (Ky. 2010) (internal citations omitted).

6

recognized can suffice as a "dangerous instrument" or "deadly weapon." In other words, the members of the jury may have equated the characterization of the gun as a "toy" or "fake gun" with the characterization of the gun as a "BB gun"—the members of the jury may not have viewed a "toy" or "fake gun" differently from a "BB gun" in the sense that a BB gun is not typically considered to equate to a traditional firearm but can still constitute a dangerous instrument or deadly weapon. Put more simply, who is to say that a BB gun, not considered to be a traditional firearm, but considered a dangerous instrument or deadly weapon under our jurisprudence, cannot be referred to as a "toy" or "fake gun"?

In any event, as we recognized in *Johnson*, the jury was entitled to believe that a "BB gun," which Slinker termed the gun in question to be numerous times at trial, constitutes a deadly weapon or dangerous instrument. The trial court did not err in denying Probus's motion for a directed verdict.

### B. Probus's due process rights were not violated when the Commonwealth allegedly chose to prosecute his case on a different theory than his co-defendant's, who pled guilty to a lesser offense.

Probus argues that his due process rights were violated when the Commonwealth characterized the gun at issue in Probus's case as a deadly weapon but did not do so in Slinker's case. While the Commonwealth disputes the preservation of this issue, the record reveals that Probus did make this argument to the trial court in his motion for a directed verdict. Even so, Probus's argument is meritless.

Slinker testified at Probus's trial that the Commonwealth stated during Slinker's guilty-plea colloquy that it was amending Slinker's charges from first-degree robbery and burglary to second-degree robbery and burglary because the gun that Slinker brandished was an instrument that could not be considered a dangerous instrument or deadly weapon. Probus argues that the Commonwealth cannot prosecute Probus for complicity to first-degree robbery and burglary, which requires the involvement of a dangerous instrument or deadly weapon, when the Commonwealth proceeded against the principal involved in those crimes on second-degree robbery and burglary for the alleged express reason that the Commonwealth did not believe the instrument involved in the crime constituted a dangerous instrument or deadly weapon.

But the only basis for Probus's argument that the Commonwealth reduced Slinker's charges because the gun at issue was not a traditional firearm comes from Slinker's testimony at Probus's trial. This testimony alone cannot convincingly support the assertion that the Commonwealth had no other basis for reducing Slinker's charges than this fact alone. In sum, the factual basis for Probus's argument is severely lacking, because, even if Slinker is correct that the Commonwealth reduced his charges based on the characterization of the gun at issue, the Commonwealth could have reduced Slinker's charges for several other reasons.

Moreover, Probus's argument relies on a fundamentally flawed assumption—that the Commonwealth cannot proceed against a complicitor on greater charges than the charges to which the principal pleaded. But an

overwhelming majority of jurisdictions hold to be true the opposite of Probus's

argument—a conviction of a principal based on a plea agreement to a lesser

offense does not preclude the prosecutor from pursuing a greater offense at

trial against a complicitor.[4] As the Indiana Supreme Court explained, where the

principal agrees to a plea bargain of a lesser charge and the complicitor is

found guilty at trial of a greater offense, "while both [the principal and

complicitor] have been convicted, we are not presented with two separate

judicial determinations on the merits. Therefore, these convictions do not

present the legal inconsistency which may arise under certain circumstances

in the trials of accessories and principals and which the law must correct."[5] In

other words:

> [A]lthough courts have recognized a necessity for consistency in
> certain situations in this area, they have done so because of
> certain assumptions implicit in a finding by a court after a trial on
> the merits. However, these same assumptions do not arise, nor are
> the same forces at work, upon an entrance of a guilty plea. When
> the principal is found guilty after a trial on the merits of a lesser
> offense than the one originally charged, an assumption may be
> made that the State failed to adequately carry its burden on the
> principal's greater offense. . . . On the other hand, in the situation
> where a plea to a lesser offense is accepted by a court it cannot be
> presumed to be a finding of an acquittal of the greater because of
> the special nature of the plea bargain that often underlies it. The

---

[4] *See* Donald M. Zupanec, *Acquittal of principal, or his conviction of lesser degree of offense, as affecting prosecution of accessory, or aider and abettor,* 9 A.L.R. 4th 972 (originally published in 1981, updated weekly); *see e.g. U.S. v. Coppola,* 526 F.2d 764 (10th Cir. 1975); *Oaks v. People,* 424 P.2d 115 (Colo 1967); *Combs v. State,* 295 N.E.2d 366 (Ind. 1973); *Jewell v. State,* 397 N.E.2d 946 (Ind. 1979); *State v. Cassell,* 212 S.E.2d 208 (N.C. 1975); *Bridges v. State,* 263 So.2d 705 (Ala. App. 1972); *People v. Hines,* 329 N.E.2d 903 (Ill. App. 1975); *but see State v. Ward,* 396 A.2d 1041 (Md. 1978).

[5] *Jewell v. State,* 397 N.E.2d 946, 948 (Ind. 1979) (citing *Combs v. State,* 295 N.E.2d 366, 370-71 (Ind. 1979)).

9

very nature of a plea bargain presupposes a restraint by the prosecutor on the punishment to be extracted from the accused.[6]

Regardless of the Commonwealth's reason for offering a plea bargain to Slinker, Probus's conviction of a greater offense does not violate due process, as Probus has alleged, because Slinker *pleaded guilty to*, i.e. was not *found guilty at trial of,* a lesser offense. As such, no due process violation occurred.

## C. The trial court did not err in allowing testimony regarding Sergeant Whitehill's commendations and acts of exceptional heroism.

Probus's next allegation of error was the admission of testimony regarding Sergeant Whitehill's commendations and acts of exceptional heroism. That this issue is preserved for our review is undisputed.

Sergeant Whitehill was the lead investigator. During Probus's opening statement, Probus stated that Sergeant Whitehill's investigation was "sloppy," "unprofessional," and "lazy." Probus readily admits to this fact. The Commonwealth called Sergeant Whitehill as a witness. During direct examination, after inquiring about Sergeant Whitehill's education, background in criminal justice, and job history, the Commonwealth inquired about various commendations that Sergeant Whitehill received over the course of his career. This led to Sergeant Whitehill to describe in detail three events leading to his commendations. The defense objected to this testimony on relevancy grounds, the same grounds on which Probus now challenges the admission of this testimony.

---

[6] *Combs*, 295 N.E. at 370–71.

"All relevant evidence is admissible, except as otherwise provided[.]"[7] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[8] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[9] "The inclusionary thrust of the law of evidence is powerful, unmistakable, and undeniable, one that strongly tilts outcomes toward admission of evidence rather than exclusion."[10] "The language of KRE 403 is carefully calculated to leave trial judges with extraordinary discretion in the application and use of [KRE 403]."[11]

"The standard of review on evidentiary issues is abuse of discretion."[12] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[13]

Probus takes issue with the inclusion of Sergeant Whitehill's testimony regarding his commendations and the events giving rise to them. Probus

---

[7] Kentucky Rules of Evidence ("KRE") 402.

[8] KRE 401.

[9] KRE 403.

[10] Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.05[2][b] (5th ed. 2013) (citing *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1967)).

[11] Lawson, *supra* note 10, at § 2.15[2][b].

[12] *Stansbury v. Commonwealth*, 454 S.W.3d 293, 297 (Ky. 2015) (citing *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007)).

[13] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

11

argues that this testimony should have been excluded because of its alleged irrelevancy and prejudicial impact on the jury.

While the admission into evidence of Sergeant Whitehill's commendations and a detailed description of the events giving rise to them could be argued as pushing the bounds of relevancy and prejudicial effect in Probus's case, we cannot say that the trial court abused its discretion in allowing this evidence, particularly when Sergeant Whitehill's investigative abilities were placed in issue by Probus during opening statement. As Professor Lawson notes, the application of KRE 401, 402, and 403 "embraces not just a tilt toward admission over exclusion but a very powerful tilt in that direction."[14] Furthermore, trial judges have "extraordinary discretion in the application and use of" the evidentiary rules of relevancy.[15] As such, we decline to hold that the trial court erred in admitting evidence of Sergeant Whitehill's commendations and the events giving rise to them.

## D. The admission of evidence of Probus's purported prior bad acts does not amount to reversible error.

Probus next takes issue with the inclusion of two different pieces of evidence that purport to constitute evidence of prior bad acts that he argues should have been excluded. The parties dispute the Court's ability to review this issue.

The first piece of evidence in dispute is the testimony of Steven Vaughan, the individual who purportedly committed an attempted robbery of Billy's

---

[14] Lawson, *supra* note 10, at § 2.15[2][b].

[15] *Id.*

residence with Probus before the events giving rise to this case. Probus complains about the admission of Vaughan's testimony describing Probus's drug use, which Vaughan discussed in response to the Commonwealth's inquiring about the relationship between Vaughan and Probus. After Vaughan made two separate and unsolicited statements alluding to Probus's drug use, Probus objected; and the trial court asked counsel to approach the bench. After discussion, the trial court, as agreed to by both the Commonwealth and Probus, brought Vaughan to the bench and told him to refrain from mentioning Probus's alleged drug use.

After Vaughan finished testifying, the parties discussed the matter in chambers. Defense counsel stated that Probus was angry that defense counsel did not request a mistrial based on Vaughan's testimony about Probus's alleged drug use. Defense counsel, however, did not believe the inclusion of Vaughan's testimony rose to the level of prejudice warranting a mistrial. The trial court then asked defense counsel if he wanted an admonition to the jury, but defense counsel specifically declined that request, believing that an admonition would do more harm than good. The trial court then stated for the record that it was denying any motion for a mistrial.

We have addressed this scenario before: "If an admonition is offered in response to a timely objection but rejected by the aggrieved party as insufficient, the only question on appeal is whether the admonition would have

cured the alleged error."[16] The presumption that an admonition can cure a defect in testimony is "overcome in only two situations: (1) when an overwhelming probability exists that the jury is incapable of following the admonition *and* a strong likelihood exists that the impermissible evidence would be devastating to the defendant; or (2) when the question was not premised on a factual basis *and* 'was "inflammatory" or "highly prejudicial."'"[17]

To start, nothing about the Commonwealth's questioning prompted Vaughan's statements about Probus's alleged drug use—Vaughan voluntarily made these statements in his account of how he and Probus met and in a description of their relationship. In addition, no doubt an admonition could have cured the potential for error here. Nothing about Probus's alleged drug use had any real impact on the case apart from the stigma the jury may have assigned to Probus upon hearing he used drugs. More importantly, we fail to see how the trial court's instructing the jury to disregard Vaughan's testimony about Probus's alleged drug use could not have cured the admission of that testimony into evidence. In sum, we cannot find reversible error in the admission of testimony regarding Probus's alleged drug use.

The second piece of evidence in dispute is the admission of text messages sent between Probus and an individual named Danny Ross in the early morning hours preceding the home invasion, exchanged from 6:15 a.m. to 6:36 a.m. As part of his defense, Probus alleged that he was home sick on the day of

[16] *Sherroan v. Commonwealth*, 142 S.W.3d 7, 17 (Ky. 2004) (citing *Graves v. Commonwealth*, 17 S.W.3d 858, 865 (Ky. 2000)).

[17] *Sherroan*, 142 S.W.3d at 17 (internal citation omitted) (emphasis in original).

the crime. The Commonwealth sought to introduce a text message exchange between Probus and Ross to counter this allegation. Probus objected to the introduction of these text messages. Probus and the Commonwealth engaged in a lengthy bench discussion about them. This culminated in both parties going through the text messages line-by-line and agreeing to what was to be redacted, which was approved by the trial court.

Probus now claims that the introduction of the text messages that he agreed to be admitted into evidence was error. But, "[i]t has long been the law of this Commonwealth that an error will not be reviewed on appeal if the trial court has not had an opportunity to rule on the objection."[18] Although Probus initially objected to the admission of the text messages, he then came to an agreement with the Commonwealth, with approval by the trial court, as to the exact content that was to be admitted.

While the Commonwealth is correct in arguing that Probus has waived this issue for review on appeal, we must still review this alleged error for palpable error.[19] Palpable error requires a showing that the alleged error affected the "substantial rights" of a defendant, where relief may be granted "upon a determination that manifest injustice has resulted from the error."[20] To find that "manifest injustice has resulted from the error," this Court must conclude that the error so seriously affected the fairness, integrity, or public

---

[18] *Commonwealth v. Petrey*, 945 S.W.2d 417, 419 (Ky. 1997) (citing Kentucky Rules of Criminal Procedure ("RCr") 9.22; KRE 103(a)(1)).

[19] *Petrey*, 945 S.W.2d at 419.

[20] RCr 10.26.

reputation of the proceeding as to be "shocking or jurisprudentially intolerable."[21]

We can definitively say that the inclusion of the content of the complained-of substance of the text messages did not rise to the level of palpable error to require reversal. The complained-of content of the text message exchange is as follows:

> Probus: Cmere before u go to work I have to ask u a ? Bout the FBI coming here soon.
> Ross: F*** U AND FBI. . . AINT GOT TIME FOR IT
> Probus: Well u will then they run in
> Probus: When they do run in I'm tellin them u useally carry a gun so they tase the s*** outta u
> Ross: Ir f***** stupid. . . I won't be here anyway. . . some people work
> Probus: I'm sure they ll grab u both from work
> Ross: Nope. . . no reason. . . ain't done s*** to worry bout it
> Probus: Ok
> Probus: Ohhh believe me by Monday morning I have a feeling that lots of running will b taking place. . . I tried to warn ya. . . I'm so f***** stupid but nobody expects me to b smart.
> Ross: Wut u talkin bout. . . what u do
> Probus: I'll tell u after work if I get a chance
> Ross: Well i believe i tryed to and tryed to tell u not to do stupid s*** . . . tell me now.
> Probus: Cnt. Text messages are saved by AT&T after deleted for 48 hours.
> Ross: OMG call
> Probus: Ill tell u later just text me when u get off work u may have to meet me somewhere an get my keys to the house.

Regardless of any purported trial court error regarding the admission of the content of these messages, we are convinced that any such error did not amount to palpable error.

---

[21] *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

Probus argues that the admission of the content of these messages suggested prior bad acts committed by Probus, unrelated to the commission of the crimes at issue. But a plain reading of the messages casts some doubt about that assertion. To start, it appears that Probus could be suggesting prior criminal activity on the part of Ross, not himself. And the messages seem to reveal an allusion to the crimes that would be occurring later that day, i.e., the crimes at issue in this case. This also calls into question Probus's objection to the introduction of this evidence on relevancy grounds. The basis for Probus's argument on this issue is lacking, and as such, we cannot find any purported error on the part of the trial court that amounts to palpable error.

### E. The trial court did not err in admitting evidence of cell phone usage between Probus and Slinker.

Probus's next allegation of error is the trial court's admiting into evidence the exchange of text messages between Slinker and Probus the night before and the morning of the crimes in question. That this issue is preserved for our review is undisputed.

Recall that Slinker testified that Probus sent Slinker text messages the night before and the morning of the occurrence of the crimes in question. In apparent corroboration of that testimony, the Commonwealth sought to introduce records evidencing phone calls and text messages made between Probus and some of the witnesses testifying in this case, including Slinker, Robinson, and Ross. But the Commonwealth did not introduce the content of those messages.

17

Probus takes issue with the admission of the records evidencing the messaging that occurred between Probus and Slinker without the accompanying content of the messages. More specifically, Probus challenges the relevancy of the admission of these records because of the lack of its accompanying content.

As outlined earlier, the application of KRE 401, 402, and 403 "embraces not just a tilt toward admission over exclusion but a very powerful tilt in that direction."[22] From Probus's argument on this issue in his brief, it appears that Probus only challenges the admission of the content of the phone records related to evidencing an exchange of text messages between Probus and Slinker, not between Probus and the others mentioned. Probus's argument is meritless.

Probus strongly objects to the inclusion of the records because they lack the content of the messages exchanged between Probus and Slinker, which, Probus argues, could have been about something completely unrelated to the crime at issue. Probus argues that the content of the messages was recoverable and that the Commonwealth's introduction of the records without the content was highly prejudicial in violation of KRE 403. But evidence of conversation occurring between Probus and Slinker the night before and morning of the occurrence of the crime at issue, coupled with Slinker's testimony, is highly relevant because it partly confirms Probus's involvement in the crime at issue.

---

[22] Lawson, *supra* note 14, at § 2.15[2][b].

If the content of the messages were truly exculpatory, as Probus suggests, and the content of the messages were, in fact, recoverable, then Probus also had the ability to recover and uncover the content of them at trial, which he did not do. More importantly, records of phone calls and text messages exchanged between Probus and Slinker the night before and morning of the occurrence of the crimes at issue are relevant to evidencing communication between the two purportedly main culprits of the crimes at issue right before the occurrence of those crimes. Again, citing the highly inclusive nature of the admission of evidence under KRE 401, 402, and 403, we decline to find that the trial court abused its discretion in admitting this evidence.

**F. No reversible error occurred from the trial court's exclusion from evidence a photograph showing Probus in the hospital four days after the home invasion and text messages Probus sent friends also purportedly evidencing that fact.**

Probus next argues that the trial court erred in excluding evidence that was purportedly "critical to his defense." Probus takes issue with the exclusion of two pieces of evidence: 1) a picture showing him in the hospital with an IV four days after the crime at issue occurred; and 2) text messages between him and his friends discussing him being on his way to the hospital. The Commonwealth does not dispute the preservation of the challenge to the first piece of evidence but does dispute the preservation of the challenge to the second piece of evidence.

Regarding the photograph evidence, the Commonwealth took issue with the introduction of the photograph on hearsay grounds and the fact that the

19

Commonwealth could not challenge the substance of the photograph on cross-examination. The trial court essentially agreed with the Commonwealth and ruled that the photograph could not be introduced unless Probus testified. The trial court also excluded the admission of text messages between Probus and his friends whereby Probus purportedly informed his friends that he was going to the hospital.

The characterization of the photograph at issue here as hearsay is highly questionable. We take note of the following guidance regarding whether a photograph constitutes hearsay evidence:

> A photograph . . . is ordinarily not hearsay. However, if the image depicted is a person making an oral or written assertion, or performing nonverbal conduct intended as an assertion, such depiction is hearsay when offered to prove the truth of the matter asserted. Thus, a digital recording of an accident scene showing the position of the cars as they came to rest does not raise a hearsay issue. Conversely, a digital recording of the same scene capturing the driver of one car stating that the other driver ran a red light would be hearsay when offered to prove that the other driver ran a red light.[23]

Regardless of the propriety of the trial court's rulings regarding the exclusion of these two pieces of evidence, we can definitively say that any purported error on the part of the trial court was harmless.

"No error in . . . the admission . . . of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of

---

[23] Michael H. Graham, *Winning Evidence Arguments*, § 401:7 (Nov. 2018 update) (internal citations omitted).

20

such relief would be inconsistent with substantial justice."[24] "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."[25] "[A] nonconstitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error."[26] "[T]he inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[27]

The evidence that Probus wanted to introduce purportedly supported his assertion that he was at the hospital four days after the crimes at issue occurred. Probus's proffered defense was that he was sick on the day of the crimes in question, so he could not have committed the crimes. But the evidence he proffered for such an assertion only supports the fact that he was sick four days after the crimes occurred. We would be hard pressed to rule that the jury would have been substantially swayed to believe Probus's alibi of being sick on the day of the occurrence of the crimes when all the evidence he proffered only purportedly showed him being sick four days after the crimes took place.

---

[24] Kentucky Rules of Criminal Procedure ("RCr") 9.24.

[25] *Id.*

[26] *Murray v. Commonwealth*, 399 S.W.3d 398, 404 (Ky. 2013) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)).

[27] *Murray*, 299 S.W.3d at 404 (quoting *Kotteakos*, 328 U.S. at 765).

Moreover, the evidence against Probus included, but was not limited to: 1) the testimony of Slinker, Probus's complicitor in the crime, describing in detail the events of the crimes and implicating Probus; 2) Steven Vaughan, who admitted to having attempted the first home invasion of Billy's house with Probus; and 3) physical evidence connecting Probus to the crime, including Billy's girlfriend's stolen purses and items used in the commission of the crime, like the walkie-talkies and cellphone jammer, found at Probus's residence. Considering the above, we are satisfied that the exclusion of Probus's purported exculpatory evidence was harmless error.

## G. The trial court did not err when it did not poll the jury after the foreperson apparently reported an apparent mistake regarding Probus's recommended sentence.

Probus's last alleged error is one concerning the sentencing phase of his trial. The preservation of this issue is disputed.

The jury recommended to the trial court a sentence of 20 years each for the complicity to first-degree robbery and burglary convictions, enhanced to 25 years each as a PFO, to run concurrently, and five years for each of the complicity to wanton endangerment convictions, enhanced to 10 years each as a PFO, to run consecutively, for a total of 45 years' imprisonment. Upon hearing the jury's recommendation, the trial court asked both parties if they wanted to poll the jury, and both parties declined. The trial court then accepted the jury's recommended sentence and discharged the jury.

After the jury was discharged, the foreperson approached the bench and indicated to the trial court that the jury may have made a mistake. Per the

22

record, which is very difficult to hear, the foreperson appears to state that the jury believed that Probus should serve only 25 years and that the jury was confused regarding parole eligibility.

Probus filed a motion for a new trial based on the conversation between the foreperson and the trial court. Although the trial court showed concern about the situation, the trial court denied Probus's motion, acknowledging that this would be an appealable issue and that Probus would get a new sentencing hearing if the defense was correct in its assertion that the jury was confused about the sentence.

Probus acknowledges that he may have waived this issue by declining to request a poll of the jury.[28] Having so failed, Probus now asks us to order a new sentencing phase or, at the very least, order the trial court to conduct an evidentiary hearing on this matter. The only reason this issue is before the Court is because the foreperson approached the bench to notify the trial court of the jury's possible mistake in the sentence it recommended.

However, "[i]t has long been held that a juror may uphold his verdict but may not impeach it."[29] "As recently as three years ago, this Court reaffirmed our commitment to the historic rule prohibiting the use of post-trial juror statements to impeach a facially valid verdict—a rule, as we said in *Commonwealth v. Abnee*, that is 'firmly rooted in the early years of Kentucky

---

[28] *See Mayo v. Commonwealth*, 322 S.W.3d 41, 57–58 (Ky. 2010).

[29] *Grace v. Commonwealth*, 459 S.W.2d 143, 144 (Ky. 1970) (internal citations omitted).

jurisprudence."[30] The only two exceptions to this rule recognized by this Court at this point allow the use of juror testimony to impeach a verdict only when the testimony "concern[s] any overt acts of misconduct by which extraneous and potentially prejudicial information is presented to the jury" or to evidence juror bias.[31] Because these two exceptions are not the basis for challenging the verdict in this case, we decline to revisit Probus's sentence. Just as in *Maras*, "[i]n sum, [Probus's] challenge is 'the one form of attack on a verdict that has always been forbidden in Anglo-American criminal law': an attempt 'to probe [the jury's] process of deliberation and find out how . . . the jury reached its verdict."[32]

### III. CONCLUSION

Finding no reversible error, we affirm the judgment.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. All concur.

---

[30] *Maras v. Commonwealth*, 470 S.W.3d 332, 333 (Ky. 2015) (quoting *Commonwealth v. Abnee*, 375 S.W.3d 49, 52 (Ky. 2012)).

[31] *Maras*, 470 S.W.3d at 335 (internal citations omitted). We seemingly alluded to in *Maras* the fact that a misapplication of the law could possibly warrant revisiting a jury verdict. *Id.* at 336. But what occurred here in Probus's case, per the statements made by the foreperson, was not a misapplication of the law, but a potential *misunderstanding* of the law relating to parole eligibility—the jury possibly believed that parole eligibility meant Probus would be out of prison at the time parole eligibility kicked in. However, "we are charged with refraining from entertaining suspicion or engaging in conjecture that the jury verdict may have resulted from compromise, mistake, or even carelessness—after all, 'juries may indulge in precisely such motive or vagaries' and 'verdicts cannot be upset by speculation or inquiry into such matters.'" *Id.* at 337 (internal citations omitted).

[32] *Id.* at 336 (internal citations omitted).

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Courtney Hightower
Assistant Attorney General