RENDERED: DECEMBER 1, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1376-MR

COMMONWEALTH OF KENTUCKY               APPELLANT

APPEAL FROM OLDHAM CIRCUIT COURT
v.      HONORABLE CHARLES R. HICKMAN, SPECIAL JUDGE
ACTION NO. 15-CR-00098

PERRY JACK PROBUS, JR.                  APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: EASTON, ECKERLE, AND JONES, JUDGES.

ECKERLE, JUDGE: The Commonwealth of Kentucky appeals an order vacating Perry Jack Probus, Jr.'s 45-year imprisonment sentence after the Circuit Court concluded that Probus's trial counsel's assistance was ineffective. Though Probus raised multiple allegations in his Kentucky Rules of Criminal Procedure ("RCr") 11.42 motion, the Trial Court reserved ruling on most of Probus's post-conviction

claims after finding ineffective assistance on one claim.  Following our *de novo* review of the legal conclusions, we respectfully disagree that ineffective assistance of counsel occurred on that single claim, and, thus, we reverse and remand for further proceedings on the outstanding claims.

### BACKGROUND

Probus was an accomplice to a home invasion and robbery.  He was ultimately convicted of complicity to commit first-degree robbery, complicity to commit first-degree burglary, two counts of complicity to commit first-degree wanton endangerment, and of being a persistent felony offender in the first degree.  Probus's prior convictions include being a convicted felon in possession of a firearm, burglary in the third degree, theft by unlawful taking under $500, possession of burglary tools, receiving stolen property under $500, facilitation to manufacturing methamphetamine with a firearm, receiving stolen property over $500, and illegal possession of a controlled substance.  The facts underlying Probus's conviction were thoroughly detailed by the Kentucky Supreme Court's published opinion on direct appeal affirming his 45-year sentence:

> Tammy Robinson was working as a nanny when at mid-morning she answered a knock at the door.  There stood a man later identified as Solomon Slinker.  He was dressed as a deliveryman and claimed he had a package for the homeowner, "Billy."  Slinker asked Robinson for a signature, so Robinson went to find a pen.

As Robinson returned to the door, she found Slinker inside the house pointing a gun at her. After a brief struggle, Slinker subdued Robinson. Robinson told Slinker to take whatever he wanted but not to harm Billy's two children, who were also in the house at the time. Slinker tied Robinson's hands together with zip-ties, but she broke free when one of the children ran to her. Slinker then pushed Robinson and the child into the bathroom and followed them inside the bathroom. While inside the bathroom, Robinson heard drilling and banging coming from inside the house, prompting her to conclude that another person had entered the house and was making those noises.

Eventually, Slinker left the bathroom, and Robinson retrieved her cell phone and called for help. Robinson did not encounter any other intruder after Slinker left the bathroom. Sergeant Ray Whitehill arrived, and his investigation revealed, among other things of interest, a blue U-Haul blanket covering a safe in the garage. Sergeant Whitehill later found out that the safe had been moved to the garage from the master bedroom. Sergeant Whitehill then spoke with Robinson, Billy, and some neighbors. Of note, one of the neighbors recalled seeing a white Ford F-150 in Billy's driveway. After speaking with these individuals, Sergeant Whitehill received a call from Kathy Hatcher.

Hatcher asked if there had been a home invasion "the other night" in the neighborhood. Hatcher stated that her son, Slinker, may have been involved. Hatcher told Sergeant Whitehill that her husband overheard Slinker's phone conversation in which Slinker stated that he and "P.J." had "made the news" but were unable to get the safe. Hatcher's husband identified "P.J." as the defendant in this case, Perry Jack Probus.

Sergeant Whitehill arrested Slinker on an outstanding warrant for an unrelated crime. Sergeant Whitehill took that opportunity to interview Slinker about

the home invasion, and Slinker admitted to the crime and implicated Probus. Slinker gave an account of the events surrounding the home invasion.

Slinker and Probus had become housemates earlier in the month. Slinker learned of a failed invasion of Billy's home that Probus and an individual named Steven Vaughan had attempted. Slinker offered to help Probus make another attempt at the home invasion.

Probus showed Slinker Robinson's Facebook picture and told Slinker that Robinson would be the one answering the front door of Billy's residence. Probus apparently told Slinker that Billy would pay them $3500 to take a safe from the house or $1000 to retrieve paperwork out of the safe if they could not take the safe.

The evening before the home invasion, Probus sent Slinker a text telling him to be ready the following morning. Later, on the morning of the invasion, Probus texted Slinker, telling him to get ready. Slinker dressed as a UPS deliveryman. Probus brought the white F-150 truck to be used in the home invasion, while Slinker brought zip-ties, a cellphone jammer, walkie-talkies, a clipboard, and a box. At the suggestion of Probus, Slinker also brought a BB gun with the orange tip removed.

Probus and Slinker arrived at Billy's residence and the events with Robinson transpired as described above. As Slinker guarded Robinson and the child inside the bathroom, Probus signaled for Slinker to exit the house and return to the truck. Slinker saw that Probus had not retrieved the safe and asked Probus about it. Probus responded that the safe was too heavy but both would still be paid.

Upon arriving at Probus's house, Probus told Slinker to leave and lay low for a while. When Slinker asked Probus about the money, Probus told Slinker that

he had retrieved some laptops and purses that they could sell and split the proceeds.

Because of Slinker's confession, Sergeant Whitehill obtained a search warrant for Probus's residence where he collected several Coach purses, (identified as belonging to Billy's girlfriend who resided at Billy's home), walkie-talkies, a cell phone jammer, two U-Haul blankets, and other various items of interest.

Probus was indicted. After two mistrials, at Probus's third trial, the jury convicted Probus of complicity to first-degree robbery, complicity to first-degree burglary, two counts of complicity to first-degree wanton endangerment, and of being a persistent felony offender, recommending a total sentence of 45 years' imprisonment, which the trial court imposed.

*Probus v. Commonwealth*, 578 S.W.3d 339, 342-44 (Ky. 2019) (footnote omitted).

The first mistrial occurred because the Commonwealth made an erroneous statement during opening statements. The second mistrial was due to a witness for the Commonwealth stating that Probus was on parole, and thus indicating that Probus was a convicted felon. Neither of these errors occurred during the third trial, which resulted in the convictions listed above.

Following his direct appeal, Probus filed an RCr 11.42 motion raising numerous post-conviction claims. One of those claims involved whether Probus's trial counsel[1] was ineffective in her investigation and presentation of evidence regarding the weapon used during the robbery and burglary. Notably, the weapon

---

[1] Hereinafter referred to as "Defense counsel."

used was never recovered, and testimony at trial identified the weapon variously as a BB gun, a fake gun, a toy gun, and an Airsoft gun. Specifically, Probus alleged in his post-conviction motion that Defense counsel should have conducted a more thorough investigation into evidence that Airsoft guns do not meet the statutory definition of dangerous instrument or deadly weapon, and that she should have presented that additional evidence at trial. The Trial Court held an evidentiary hearing on the post-conviction motion. Defense counsel testified regarding her investigation and trial strategy.

Defense counsel is an experienced criminal defense attorney who has worked for both the Louisville Metro Public Defender's Office and the Department of Public Advocacy. During her career, Defense counsel participated in approximately 20 trials. Utilizing her experience, Defense counsel conducted extensive investigation and spent lengthy amounts of time preparing for Probus's three trials. Defense counsel formulated and employed three methods of defense for Probus, ultimately seeking an acquittal on all charges.

First, Defense counsel attempted to get the Trial Court to conform the charges against Probus to charges that conformed to Slinker's plea-bargain charges. Regarding the principal perpetrator, Defense counsel was aware that Slinker had pled guilty to second-degree robbery and other lesser charges in exchange for a reduced sentence. Prior to trial, Defense counsel attempted to get

Probus's charges amended to conform with Slinker's plea, arguing the amendments were due to the weapon not being a dangerous instrument or a deadly weapon. The Trial Court rejected that argument, finding the nature of the weapon was a factual issue for the jury. The Kentucky Supreme Court on direct appeal likewise rejected that this claim violated Probus's rights to due process when the Commonwealth chose to prosecute Slinker on a different theory than Probus. *Probus*, 578 S.W.3d at 345-46.

Second, Defense counsel then attempted to undercut the reliability of the Commonwealth's evidence by showing the jury that the Commonwealth's view of the type of weapon used was inconsistent and changing:

> So basically, what it was, was, we wanted the jury to see
> that when it inured to his benefit, it was this kind of
> weapon, and when it was against Mr. Probus, it was now,
> all of a sudden, a bb gun, capable of firing metal pellets.
> And he (Slinker) indicated, in his testimony, that they
> fired metal pellets.

Video Record ("VR") 2/25/22, 9:47:26. On direct appeal, the Kentucky Supreme Court rejected Probus's argument that "the Commonwealth offered insufficient evidence that the gun with which Slinker threatened Robinson constituted a 'deadly weapon' or 'dangerous instrument[.]'" *Probus*, 578 S.W.3d at 344-45.

Third, Defense counsel employed an alibi defense. Defense counsel proffered evidence to the jury that Probus was at his own home during the crime. Defense counsel presented the testimony of another person who lived at Probus's

residence to testify that he had video cameras around the compound and daily would review the cameras to see if anything had occurred. The witness testified that he had reviewed the security cameras for the morning and afternoon of the commission of the crime and had not seen Probus leave.

Concerning her investigation, Defense counsel testified that her work product was extensive, producing some 20 banker's boxes of files. Defense counsel's investigation included listening to Slinker's plea colloquy and having others listen to it. No one could determine whether Slinker said what type of projectiles were fired or could be fired from the weapon he used to commit the crime. Defense counsel also utilized an intern to research Airsoft guns, discovering that there are some Airsoft guns that fire metal pellets that can meet the statutory definition of dangerous instrument or deadly weapon. Defense counsel reviewed the law and believed that whether the weapon was capable of being a deadly weapon would ultimately be a fact question for the jury.

Furthermore, Defense counsel strategically exploited a patent error in the indictment without bringing it to the Commonwealth's attention until later in the trial. The Commonwealth had not indicted on all sustainable theories of the burglary and robbery crimes, including a theory that the victim suffered physical injury. For example, the robbery statute allows for a conviction under multiple theories, including if physical force is used that causes physical injury to a non-

participant in the crime.[2]  Defense counsel noted, "As you are perfectly well aware, there was a huge fight between the victim and Mr. Slinker, for purposes of a robbery conviction."  VR 2/25/22, 9:49:30.  Indeed, the photographs introduced showed extensive bruising to one of the victims.  Defense counsel's strategy was to utilize her above theories to cast doubt that the weapon was not a deadly weapon or dangerous instrument, all the while preparing a legal defense against the possible attempt by the Commonwealth to amend the indictment to include the physical injury theory.

Defense counsel's strategy on the amendment was successful.  The Commonwealth was not permitted to amend the indictment after the presentation of evidence, and Defense counsel pigeonholed the Commonwealth to proving that a deadly weapon or dangerous instrument was used.

---

[2] Kentucky Revised Statutes ("KRS") 515.020, as it read when the underlying actions occurred, provided that a person commits robbery in the first degree:

> . . . when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:  (a) Causes physical injury to any person who is not a participant in the crime; or (b) Is armed with a deadly weapon; or (c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

KRS 515.020(1)(a)-(c).  In contrast, a person commits second-degree robbery when the perpetrator of the theft uses or threatens the immediate use of physical force with the intent to accomplish the theft.  KRS 515.030.

"The case law wasn't on my side. I have to be honest with you, I was surprised when the judge did not allow the amendment prior to the submission to the jury, um, because the notice requirement was, it was all over the discovery – the physical force and the fight and the allegations – and, you know, we did what we could, which was focus on one area where we believed that we had the wiggle room to make the argument and say, judge, this is, this is not, and we were fortunate, and [the judge] agreed." VR 2/25/22, 9:50:36. "It (the physical force theory) was not in the indictment. They literally, you know, usually in an indictment they do both theories, but in this specific indictment they specifically left out that portion of the statute." VR 2/25/22, 9:51:38.

In addition to keeping the indictment narrow, Defense counsel's strategy was to attack Slinker's testimony regarding the weapon used. To combat the statutory definition of dangerous instrument, Defense counsel's research showed that the main difference between an injurious Airsoft gun and a non-injurious Airsoft gun was on the type of pellet used, "and that's why we focused on that." VR 2/25/22, 9:53:02. Defense counsel summarized her strategy in the following exchange:

> Def. Counsel: At that point in time, I'll be honest with you, I just didn't know, and our position was there's no proof that there were metal pellets. You know, that it was not in Solomon's plea colloquy. They didn't ask about it. Um, and we knew from the research that there were Airsoft pellet guns that fired metal pellets, including

-10-

the one that he had, but we didn't know that there were metal pellets.

P.C.[3] Counsel: There was never an Airsoft gun recovered, was there?

Def. Counsel: No.

P.C. Counsel: And so . . .

Def. Counsel: It was based upon what Mr. Slinker said.

P.C. Counsel: Ok, and what Mr. Slinker did, was, consistent with his statement that he broke the orange tip?

Def. Counsel: Yes.

P.C. Counsel: Off of it?

Def. Counsel: Yes.

P.C. Counsel: To make it look more like a gun, or a real gun?

Def. Counsel: Yes.

VR 2/25/22, 10:34:23.

Defense counsel admitted she was not a firearms "person" and did not think of hiring an expert. She was aware that there is a distinction between an "actual" firearm and an Airsoft gun, though.

---

[3] In video recordings of the proceedings below, we refer to Probus's post-conviction counsel as "P.C. Counsel" and his Defense counsel as "Def. Counsel."

-11-

Charles Stephenson, a ballistics trial consultant, also testified at the evidentiary hearing. Stephenson is a military veteran with extensive experience in firearms. Stephenson received and tested an Airsoft pistol from Probus's post-conviction counsel. Stephenson explained that Airsoft weapons shoot projectiles through one of two means: some are mechanically powered, using levers and springs; and some use compressed air supplied by carbon-dioxide-cartridges. The one he tested was a mechanically-powered weapon, with a stated terminal velocity of 100-110 feet per second.

Stephenson was asked to make an overall evaluation about the effects of this particular Airsoft weapon that post-conviction counsel provided. He determined it was a "toy replica" gun with a mechanical mechanism, safe enough to conduct testing in his office. He set up ballistics gelatin and test fired plastic Airsoft projectiles at the gelatin at various distances from point-blank to three feet. None of the plastic projectiles penetrated the ballistics gel.

Stephenson concluded that the weapon provided him by post-conviction counsel was a toy, not a firearm, because it used a non-explosive mechanism for firing the projectile, and the plastic projectile was not designed to penetrate skin.

Stephenson stated that because a metal BB is a smaller diameter than the Airsoft chamber, the Airsoft gun should not be able to shoot the metal BB.

When asked if some Airsoft weapons do shoot metal projectiles, Stephenson responded that he had researched and found that Airsoft competitions are highly regulated and do not permit the use of metal projectiles. He also noted that comparatively a metallic BB gun would have a higher risk of injury than an Airsoft gun.

Stephenson created a report detailing the results of his experiments. The report was admitted, with the Trial Court noting that the gun tested was not the weapon actually used in the commission of the crimes.

On cross-examination, the Commonwealth questioned whether Stephenson was aware that some Airsoft weapons have terminal velocities of 750 feet per second, and Stephenson admitted that some Airsoft weapons can have terminal velocities that are higher than the weapon he tested, noting that the velocities can be "considerable." Those with higher velocities would shoot projectiles with more force. He did not believe a plastic Airsoft projectile would hurt more at a higher velocity, though, because it was designed to break apart upon impact.

When asked about whether an Airsoft gun could cause serious eye injuries, Stephenson responded that he was not an ophthalmologist, and that his preliminary research was "inconclusive." Stephenson did have his shatter-proof

glasses on while conducting his experiments, and he ultimately admitted that an Airsoft gun could cause an eye injury.

Probus also testified at the hearing. His testimony was limited to establishing that he had two or three Airsoft guns in his garage when Slinker purportedly went to the garage to retrieve a weapon to use in the crime. Probus said that one of his guns in the garage was "similar" to the Airsoft weapon tested by Stephenson.

## TRIAL COURT'S RULING

The Trial Court entered an order granting the RCr 11.42 motion in part, vacating the judgment, and remanding for a new trial, finding in relevant part:

> The key issue centers around [Defense] counsel's alleged failure to reasonably investigate the law as it relates to the definitions of a "deadly weapon" and "dangerous instrument," the failure to investigate the nature of an airsoft gun that was allegedly used by Slinker in this case, and the failure to present expert testimony and evidence related to airsoft guns to the jury. [Defense counsel] testified at the evidentiary hearing that she did pursue the issue of the airsoft gun being used in the offenses for which Probus was indicted. [Defense counsel] stated that during Slinker's prosecution, that the Commonwealth during the colloquy preceding the entry of Slinker's plea that the amendment of the Robbery, 1st degree charge to Robbery, 2nd degree was based in part on the fact that weapon [sic] used by Slinker in the home invasion robbery could not be considered a deadly weapon. [Defense counsel] stated that she was aware of the Commonwealth's characterization of the gun in the Slinker prosecution. The Commonwealth in prosecution of Probus at trial, tried him on the narrative that the gun

-14-

used by Slinker in the home invasion robbery was a "deadly weapon" or "dangerous instrument." [Defense counsel] made a motion requesting that the trial judge, the Honorable Judge Karen Conrad, rule that the gun used by Slinker did not meet the definition of a "deadly weapon" or "dangerous instrument." Judge Conrad ruled that whether the gun could be considered a "deadly weapon" or "dangerous instrument" was a factual issue to be determined by the jury. [Defense counsel] testified at the evidentiary hearing that she had an intern at DPA, a law student, do research on airsoft guns and she learned that airsoft guns used metal pellets. [Defense counsel] testified that she never considered consulting an expert to educate herself on the nature of the [A]irsoft gun or considered presenting expert testimony evidence about the weapon used. [Defense counsel]'s awareness of the Commonwealth's shifting stance on the characterization of the gun coupled with [Defense counsel's] own motion about the characterization of the [A]irsoft gun indicates that she was fully aware during trial preparation and the trial that the characterization of the nature of the gun used in the robbery was a key issue. That [Defense counsel] was aware of the key relevance of establishing the nature of the gun used by Slinker, it is not reasonable that she failed at trial to try to establish what type of gun was used by Slinker in the robbery during the trial.

The gun used by Slinker was never recovered in this case, and Slinker provided the only description and information about the weapon used at the trial of this matter. Slinker testified that he had broken the orange tip off a "toy gun" that was used during the home invasion robbery. Slinker during his testimony at Probus' trial referred to the gun used during the robbery as a "toy gun", "fake gun", "BB gun", "toy BB gun" and "[A]irsoft gun." Most often Slinker called the gun at issue a "BB gun." [Defense counsel] failed to try to establish at trial what the defense's position was as it pertained to the nature of the gun used. Clearly,

-15-

[Defense counsel] understood that Slinker had allegedly used an [A]irsoft gun in the robbery as she and her intern had conducted research on that type of weapon, the weapon has been characterized as such in Slinker's plea, and she sought a ruling from the trial [sic] that the [A]irsoft gun used did not fall into the definition of a "deadly weapon" or "dangerous instrument." Being cognizant of these issues, [Defense counsel] did not make reasonable efforts to establish/clarify/emphasize at trial what type of gun Slinker used in the crime. Also, [Defense counsel] failed to investigate the nature of [A]irsoft guns appropriately and present such information to the jury (potentially via expert testimony) to establish to the jury that the [A]irsoft gun used by Slinker did not meet the definition of a "deadly weapon" or "dangerous weapon". From [Defense counsel]'s motion to the trial court and request that an intern perform research on the issue of [A]irsoft guns, it appears that [Defense counsel] recognized that Slinker's use of an [A]irsoft gun in the offense was relevant, but did not make reasonable efforts in establishing before the jury: what type of weapon Slinker used and why the type of weapon used by Slinker was relevant to the charges in the case.

. . .

[The Trial Court discussed the relevant legal standards for when a weapon constitutes a deadly weapon, noting that the Commonwealth must prove that the weapon is capable of producing death or serious physical injury to meet the statutory definition.]

The Supreme Court of Kentucky in Johnson v. Commonwealth, 327 S.W.3d 501, 507 (Ky. 2010) has recognized that a jury can reasonably find that pellet and BB guns can constitute a [sic] "deadly weapons" or "dangerous instruments" given the history of serious physical injuries which have been caused by BB guns. Herein, the alleged weapon was an [A]irsoft gun, not a BB gun. Although [Defense counsel] and an intern

-16-

conducted some manner of research about [A]irsoft guns, they presumably failed to appreciate the distinction of [A]irsoft guns from BB guns or appreciate how the case law on the issue of "deadly weapons" and "dangerous instruments" was relevant to that distinction. Regardless, [Defense counsel] did not via cross-examination of Slinker or presentation of expert testimony, make reasonable efforts to communicate to the jury that Probus' argument was that Slinker used an [A]irsoft gun in the robbery or that an [A]irsoft gun is not a "deadly weapon," i.e. "the type of weapon form [sic] which a shot could cause death or serious physical injury." Wilburn [v. Commonwealth, 312 S.W.3d 321,] 329 [(Ky. 2010)]. (Note: "Dangerous instrument" means any instrument, including parts of the human body when a serious physical injury is a direct result of the use of that part of the human body, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury. KRS 500.080(3).) That expert testimony would be needed to establish the nature of an [A]irsoft gun would be clear, as it is specialized knowledge, and not information that lay people would know without [Defense counsel] presenting some evidence to the jury that an [A]irsoft gun by its nature does not qualify as a "deadly weapon" or "dangerous instrument."

At the evidentiary hearing, Probus presented the testimony of a firearms and ballistics expert, Charles Stephenson, who provided testimony about the nature of an [A]irsoft gun, is [sic] distinguished from a BB gun. Charles Stephenson performed testing using an [A]irsoft gun similar to the weapon allegedly used by Slinker in the home invasion robbery, and illustrated that an [A]irsoft gun does not eject a pellet with sufficient velocity to render it capable of breaking or penetrate [sic] human skin. Stephenson testified that [A]irsoft gun pellets will disintegrate when it strikes a surface, and that metal bbs cannot be loaded into an [A]irsoft gun. The

implication of this information on the nature of [A]irsoft guns being that [A]irsoft guns are not readily capable of causing death or serious physical injury.

As stated previously, [Defense counsel] recognized that there was an argument to be made that the [A]irsoft gun used by Slinker could not be considered a "deadly weapon" or "dangerous weapon [sic]," but did not actually put forth a reasonable effort at trial to establish that an [A]irsoft gun was used by Slinker or present any evidence or information to the jury about the nature of an [A]irsoft gun. [Defense counsel's] performance as counsel was deficient, in that she recognized an issue but did not at Probus' trial make reasonable efforts to address that issue. Probus' conviction for Complicity to Robbery, 1st degree, Complicity to Burglary, 1st degree, and two counts of Complicity to Wanton Endangerment, 1st degree all relied on the jury finding that Slinker used a "deadly weapon" or "dangerous instrument." The Court finds that Probus did suffer prejudice from [Defense counsel's] deficient performance, in that there is a reasonable probability that Probus would have obtained a different outcome if not for [Defense counsel's] errors. There is a reasonable probability that if not for [Defense counsel's] errors that Probus would have been convicted of a lesser offense. A conviction of a lower offense not only means a lower number of years, but also a radically different parole eligibility service percentage. The loss of an additional twenty years of a person's life to imprisonment is not a minor matter, and the loss of a reasonable probability to be convicted of a lesser offense because of an attorney's deficient performance is sufficiently prejudicial to a defendant.

Order at 3-8.

## STANDARD OF REVIEW

We review ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and as adopted in *Gall v. Commonwealth*, 702 S.W.2d 37 (Ky. 1985). *Commonwealth v. McGorman*, 489 S.W.3d 731, 736 (Ky. 2016). The *Strickland* standard requires proof of two prongs to establish ineffective assistance of counsel: first, counsel's performance must be deficient; and, second, that deficient performance must have prejudiced the defendant. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

Deficient performance is established when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment [to the United States Constitution]." *Id*. Our analysis of counsel's performance focuses on the reasonableness of trial counsel's actions. For example, while counsel must conduct a "complete investigation[,]" our review of the investigation is not of the investigation itself, but of the reasonableness of trial counsel's decisions, to wit: "that counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary under all the circumstances and applying a heavy measure of deference to the judgment of counsel." *Haight v. Commonwealth*, 41 S.W.3d 436,

446 (Ky. 2001), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009), adopting standard announced in *Strickland*, *supra*.

Our review must itself be comparative only to defense counsel who has reasonable abilities and means and is operating within other reasonable demands. "A reasonable investigation is not an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources, but also with the benefit of hindsight, would conduct." *Id.* (citing *Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998)).

During the reasonableness review of counsel's performance, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. "We must analyze counsel's overall performance and the totality of circumstances therein in order to determine if the challenged conduct can overcome the strong presumption that counsel's performance was reasonable." *McGorman*, 489 S.W.3d at 736.

Under the prejudice prong, "A defendant is prejudiced by counsel's deficient performance when the 'errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.'" *Commonwealth v. Searight*, 423 S.W.3d 226, 230 (Ky. 2014) (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). To prove prejudice, there must be a showing of a reasonable probability of

a different outcome had counsel's unprofessional errors not occurred. *Id.* "This reasonable probability is a probability 'sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2064). Both prongs must be met for relief to be afforded. *Id.* at 231.

On appeal of an ineffective assistance of counsel claim following an evidentiary hearing, we give deference to the trial court's factual findings and determinations of witness credibility, reviewing factual findings for substantial evidence and clear error, while ultimately reviewing *de novo* the legal conclusion of whether counsel rendered ineffective assistance pursuant to *Strickland*. *See McGorman*, 489 S.W.3d at 736.

## ANALYSIS

The Trial Court found both deficient performance and resulting prejudice on the sole issue of counsel's investigation and presentation of evidence regarding Airsoft guns. Though the Trial Court's order is thorough and thoughtful on these analyses, we respectfully disagree with both conclusions.

Initially, we begin our analysis of the Trial Court's factual findings. Even after applying great deference to the Trial Court's determination of witness credibility, we hold that there were two clear errors with the factual findings.

First, the Trial Court found that the weapon used was an Airsoft gun, not a BB gun. This factual finding is not supported by substantial evidence and is

clearly erroneous. The actual weapon used was never recovered, and the Kentucky Supreme Court on direct appeal found the evidence at trial was sufficient for a reasonable person to find that the weapon was a BB gun.

The evidence at the post-conviction hearing, on the other hand, focused on a straw weapon – an Airsoft weapon provided to Stephenson by Probus's post-conviction counsel. And the Airsoft weapon provided by post-conviction counsel was determinatively not even the same type of weapon used during the crime; at best there was a chance that it was "similar" to one of many Airsoft guns Probus owned when the crime occurred.

Moreover, the evidence at the hearing did not establish that the only possible weapon used during the commission of the crime was an Airsoft gun. Probus's testimony at the evidentiary hearing was that he had two or three Airsoft guns in the garage where Slinker had testified at trial he had obtained the weapon used for the crime. Probus further testified that the weapon tested by Stephenson was "similar" to one of the Airsoft guns in his garage. This testimony is not substantial evidence that the Airsoft gun tested was similar to the one used in the crime. There was admittedly at least one other Airsoft gun in the garage. And, more importantly, the fact that there were two or three Airsoft guns in the garage does not in and of itself prove that there were no other weapons in the garage when Slinker went to the garage to take a weapon.

Probus also argues substantial evidence supports the Trial Court's factual finding that an Airsoft gun was used because Slinker testified at trial that he broke the orange tip off the weapon. This testimony, Probus argues, should be read in light of 15 U.S.C.A.[4] § 5001(b)(1) as establishing that the weapon was an Airsoft gun. That federal statute does require a distinguishing colorant, "blaze orange," as an "integral" and "permanent[] affix[ture]" on the tip or barrel of certain firearms, including Airsoft guns, when they are first sold. It does not *require* such orange plugs or tips on firearms or traditional BB or pellet-firing air guns.

But this statute is not dispositive of the instant factual findings as it likewise does not *prohibit* an orange plug or tip from being placed on the barrel of other weapons. It is possible for a person to make a functioning firearm appear as a fake weapon. *Cf. People v. De Los Santos*, No. G037646, 2007 WL 2199995, at *3 (Cal. Ct. App. 4th Cir. Aug. 1, 2007) ("We also conclude there is also sufficient evidence to support a conclusion the weapon used to kill the victim was real, whether or not it had an orange tip.") (unpublished/non-citable in California courts by operation of Rule 8.1115 of the California Rules of Court); *Paredez v. State*, No. 04-03-00764-CR, 2004 WL 1835821, at *3 (Tex. App. Aug. 18, 2004) ("This evidence suggests that the gun was not a toy gun with an orange cap but instead a

---

[4] United States Code Annotated.

real gun with some orange paint on the end."). *Compare with*, New York City, N.Y., Code § 10-131(j)(1)(ii) (defining a firearm with a substantial portion of the exterior of the weapon in bright orange as a "deceptively colored firearm" and making ownership of the same illegal).

Moreover, Probus's argument from this statute presents a logical fallacy. As the argument goes, because the law requires that all non-deadly and non-dangerous firearms have orange tips, therefore all firearms with orange tips are non-deadly and non-dangerous. But the inverse is not necessarily true. Indeed, if all judges must wear robes, it is not also true that anyone wearing a robe must be a judge.

Additionally, all of this newly-introduced evidence at the post-conviction hearing must be read in light of the evidence adduced at trial. At trial, the evidence repeatedly demonstrated the weapon was a BB gun. The victim testified that she felt the cold steel of the weapon during the burglary and robbery. Slinker more often than not referred to the weapon as a BB gun. And the Kentucky Supreme Court on direct appeal held the evidence at trial sufficient to survive a directed verdict motion and permit a reasonable juror to find guilt beyond a reasonable doubt on the BB gun theory. The evidence at the evidentiary hearing, on the other hand, was not substantial: the weapon tested was a straw weapon selected by Probus's post-conviction counsel; Probus said he had more than one

-24-

Airsoft gun in his garage; and Probus only stated that the weapon was "similar" to one of the Airsoft guns he owned. Not weighing the veracity of this post-conviction testimony at all, but believing it all to be true, it still was not substantial evidence to say conclusively the weapon tested by Stephenson was similar to the weapon used by Slinker during the commission of the crime. Being unsupported by substantial evidence, this finding is clearly erroneous that the weapon tested was similar to the weapon used in the crime.

We also note that in this same vein of testimony, the Trial Court found the "implication" of the information given by Stephenson was that "[A]irsoft guns are not readily capable of causing death or serious physical injury." Order at 7. However, this implication is not supported by substantial evidence. It is based on Stephenson's direct examination testimony and his testing of one, defense-proffered Airsoft weapon. Stephenson testified on cross-examination that there exist other, more powerful Airsoft weapons that have substantially higher terminal velocities. Stephenson also testified that he had on protective eyewear during his tests and admitted it was possible for an Airsoft weapon to damage one's eyes. Accordingly, there was not substantial evidence to support a finding that Airsoft guns are categorically not readily capable of causing death or serious physical

injury.[5]  Moreover, such a categorical statement would necessarily be a legal conclusion that these weapons do not fit within the statutory definitions, a legal conclusion which we would review *de novo*.[6]

Second, the Commonwealth argues that the following statement by the Trial Court is an erroneous factual finding, "[Defense counsel] did not make reasonable efforts to establish/clarify/emphasize at trial what type of gun Slinker used in the crime." Order at 5.  However, whether Defense counsel's actions are reasonable is a legal conclusion that we review *de novo* in the following sections.

A.        *Strickland* **Deficient Performance.**

First, we analyze whether Defense counsel rendered deficient performance under *Strickland*.  Though the Trial Court conducted a thorough analysis and concluded that counsel's performance fell below the *Strickland*

---

[5] We further note that while the focus has been on the damage that the projectile could cause, one could wield a toy gun as a bludgeon in such a way that it could cause death or serious physical injury.  *Cf. State v. Hicks*, 14 Ohio App. 3d 25, 469 N.E.2d 992 (1984).  In Kentucky, a dangerous instrument is defined as "any instrument . . . under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury." KRS 500.080(3).  As the Trial Court correctly determined during Probus's trial, because the weapon was visible to the victim, the jury had to determine whether the evidence was sufficient to support a finding that the weapon was a deadly weapon or dangerous instrument.  *See Lawless v. Commonwealth*, 323 S.W.3d 676 (Ky. 2010) (compiling cases).  Here, we do not need to determine whether the weapon could be used as a bludgeon, but it would be error to conclude categorically that all Airsoft weapons cannot constitute dangerous instruments when they could be used as bludgeons.

[6] *See supra* Note 4 for our *obiter dicta* on this issue.

reasonableness standard, we have reviewed the evidence and, respectfully, have arrived at a different conclusion.

We reiterate that our review of counsel's performance must provide "great deference" to trial counsel and afford a "strong presumption that counsel acted reasonably and effectively." *Ford v. Commonwealth*, 628 S.W.3d 147, 156 (Ky. 2021) (citations omitted). Moreover, a counsel's investigation need only be reasonable, "not an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources, but also with the benefit of hindsight, would conduct." *Haight*, 41 S.W.3d at 446. Rather, the question is more appropriately tailored to "whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S. Ct. 2527, 2538, 156 L. Ed. 2d 471 (2003).

Here, counsel conducted a reasonable investigation and formulated a reasonable defense. The undisputed evidence showed that Defense counsel recognized one of the issues in the case – whether the weapon used fell within the statutory definitions of deadly weapon or dangerous instrument – and investigated the same and presented multiple defenses. Defense counsel researched the nature of the potential weapon used, even utilizing an intern to research Airsoft guns. Defense counsel testified that they had over 20 banker's boxes of research in the case. Defense counsel was aware that based on the research she reviewed, some

Airsoft guns can shoot metallic projectiles, which, given the law in Kentucky, could make them potentially capable of causing at least a serious, physical injury. Defense counsel was also aware, based on the law and the investigation, that the weapon would not be dangerous if it was only shooting non-metallic projectiles. Thus, she attempted in numerous ways to show that the weapon Slinker used was a toy Airsoft gun that should result in lesser charges.

To that end, at trial Defense counsel thoroughly cross-examined Slinker about the weapon, utilizing his prior statements and his plea in attempting to pin him down on the type of weapon he used:

> Def. Counsel: I want to talk to you a little bit more about this gun. Now you indicated to Detective Whitehill that it was a toy gun, is that correct?
>
> Slinker: Yes, ma'am.
>
> Def. Counsel: A fake gun?
>
> Slinker: A BB gun.
>
> Def. Counsel: Well, you didn't use BB in the statement, but was it a plastic BB gun?
>
> Slinker: It was a BB gun.
>
> Def. Counsel: I don't know what that is?
>
> Slinker: It's, uh, uh, a BB gun.
>
> Def. Counsel: Ok. There are different types of BB guns, and so let me move forward from this. You actually appeared in front of Judge Conrad to enter that plea that

Mr. Baxter [the Commonwealth's Attorney] went over you with?

Slinker:  Yes, ma'am.

Def. Counsel:  One of the reasons that the Commonwealth Attorney said at that time that he was reducing the charges was because of the type of gun that you had used, do you remember that?

Slinker:  Yes, ma'am.

Def. Counsel:  And he said that the reason that he was reducing the charges was because you told him that it was a fake gun, a toy gun, is that correct?

Slinker:  It was a toy BB gun.

Def. Counsel:  On the record you actually said to the Court that it was a, what's it called?  Airsoft gun?  Is that correct?

[Slinker shrugs.]

Def. Counsel:  We have a copy of the video tape if you'd like to watch it.

Slinker:  I don't, I . . .

Def. Counsel:  You don't remember telling the judge that it was an Airsoft gun?

Slinker:  Yes, yes, yes . . .

Def. Counsel:  Okay, so you do remember telling the judge that it was an Airsoft gun, and telling the prosecutor that it was a toy gun, that it was a fake gun?

Slinker:  Yes.

> Def. Counsel: And you got a reduction in your charges because, based upon that, is that correct?
>
> Slinker: Yes, ma'am.

VR 11/1/17, 3:02:50.

This cross-examination by Defense counsel effectively showed to the jury that Slinker previously referred to the gun as a toy, fake, and Airsoft gun. Moreover, Defense counsel effectively showed the jury that if they were to believe the gun was a toy gun, a fake gun, or an Airsoft gun, the lesser-included offenses were the proper charges, as Slinker's plea could have been based on the weapon falling into one of these three categories.[7] However, as the Kentucky Supreme Court and the Trial Court both noted, throughout the rest of Slinker's testimony, he contradicted this testimony, most often referring to the weapon as a BB gun. His testimony created a fact issue:

---

[7] As the Kentucky Supreme Court held, this testimony showed the nature of the weapon used was one of many bases that would support the reduced charges for Slinker:

> But the only basis for Probus's argument that the Commonwealth reduced Slinker's charges because the gun at issue was not a traditional firearm comes from Slinker's testimony at Probus's trial. This testimony alone cannot convincingly support the assertion that the Commonwealth had no other basis for reducing Slinker's charges than this fact alone. In sum, the factual basis for Probus's argument is severely lacking, because, even if Slinker is correct that the Commonwealth reduced his charges based on the characterization of the gun at issue, the Commonwealth could have reduced Slinker's charges for several other reasons.

*Probus*, 578 S.W.3d at 345.

whether the weapon was a deadly weapon was a question of fact that should be submitted to the jury to decide, a jury could reasonably determine that a pellet or BB gun was a deadly weapon (i.e. a type of weapon from which a shot could cause death or serious physical injury) in light of history of serious physical injuries caused by BB or pellet guns.

*Johnson v. Commonwealth*, 327 S.W.3d 501, 507 (Ky. 2010) (citations and footnotes omitted).

Defense counsel's focus on the nature-of-the-weapon defense also kept the Commonwealth from later amending the indictment to include the alternative theory for first-degree robbery, namely that the perpetrator caused physical injury to a non-participant in the crime. KRS 515.020(1)(a). *See, e.g.*, *Alderson v. Commonwealth*, 670 S.W.3d 884, 896-97 (Ky. 2023) ("Whether an amendment of an indictment during a trial to allow for a different method of committing the same crime is permissible, is a highly fact-specific inquiry depending on the evidence available to the defendant, the defenses offered and whether the defendant would be prejudiced . . . .").

We are reminded that "as a court far removed from the passion and grit of the courtroom, we must be especially careful not to second-guess or condemn in hindsight the decision of defense counsel. A defense attorney must enjoy great discretion in trying a case, especially with regard to trial strategy and tactics." *Harper v. Commonwealth*, 978 S.W.2d 311, 317 (Ky. 1998). In the

instant case, Defense counsel conducted a thorough investigation and employed defense tactics that allowed the jury to find either that Probus was completely innocent due to his alibi, or that Probus was guilty of the lesser-included offenses due to the weapon being a toy, fake, or Airsoft gun. The jury rejected both defenses, though.

In sum, based on the evidence at trial and that adduced at the evidentiary hearing, we respectfully disagree with the conclusion the Trial Court drew that Defense counsel's investigation was deficient as it related to the type of weapon used and that her performance was deficient in relation to the same issue. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable[.]" *Strickland*, 466 U.S. at 691, 104 S. Ct. 2066. Here, Defense counsel conducted a reasonable and thorough investigation of the case – including researching the nature of Airsoft guns, the contents of Slinker's plea, and the facts of the case – and she presented a three-part defense that the jury ultimately rejected. Having reasonably conducted an investigation and reasonably prepared defenses, we find Defense counsel's performance did not amount to *Strickland* deficient performance. Thus, we reverse the Trial Court on this *Strickland* prong.

**B.**      *Strickland* **Prejudice.**

Additionally, we respectfully disagree with the Trial Court that counsel's performance resulted in *Strickland* prejudice.  To find prejudice, we would have to determine that the result of the trial was unreliable.  We reiterate that under the prejudice prong, "A defendant is prejudiced by counsel's deficient performance when the 'errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.'"  *Searight*, 423 S.W.3d at 230 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).  To prove prejudice, there must be a showing of a reasonable probability of a different outcome had Defense counsel's unprofessional errors not occurred.  *Searight*, 423 S.W.3d at 230.  "This reasonable probability is a probability 'sufficient to undermine confidence in the outcome.'"  *Id*. (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

Here, Defense counsel effectively put before the jury evidence that Slinker's plea bargain was contingent on the weapon being a fake, a toy, or an Airsoft gun.  However, *arguendo*, had Defense counsel's investigation and presentation of evidence regarding Airsoft guns constituted *Strickland* deficient performance, the additional evidence from the evidentiary hearing is not of such quality as to undermine confidence in the outcome of this case.  The Trial Court's analysis on this *Strickland* prong focused solely on the reduction in time that lesser

charges would bring. But our analysis must be broader into whether the trial itself was unreliable and unfair as a result.

To that end, we note that two of the three defenses were not affected at all by the evidence from the hearing regarding the Airsoft weapon testing. Probus's alibi defense was not changed, nor was Probus's pre-trial challenge based on Slinker's plea. The jury still had factual questions to resolve. And the evidence at trial, as shown by the Kentucky Supreme Court's detailed recitation of the facts, was highly inculpatory.

Moreover, had Defense counsel presented expert testimony about the Airsoft guns, the evidence would have cut both ways as it did at the evidentiary hearing. The expert testified that some Airsoft guns do not fire at such a velocity, but he also admitted that there are some Airsoft guns that do fire at much higher velocities. Moreover, he testified that being shot in the eye could injure the eye.

Any resulting prejudice is further eroded by the fact that it was Probus's testimony at the evidentiary hearing that established the similarity between the Airsoft gun tested and the one kept in Probus's garage. Notably, Probus did not testify during the guilt phase at his trial.

Accordingly, we cannot say that failure to present this additional evidence resulted in a trial whose result is unreliable. Thus, we reverse on this issue and remand for further proceedings on Probus's remaining claims.

### C.  Procedural Bar.

The Commonwealth also argues that Probus's underlying claim on this issue is procedurally barred as having been raised and rejected on direct appeal. The Commonwealth cites to *Prescott v. Commonwealth*, 572 S.W.3d 913 (Ky. App. 2019). Having already found there was no ineffective assistance of counsel on the underlying claim, we need not address this alleged, procedural bar. We note, however, that a review of the reasonableness of Defense counsel's investigation and the reasonableness of Defense counsel's presentation of the evidence is collateral to a review of the sufficiency of the evidence and not "redundant" or "essentially the same components of his original arguments presented on direct appeal, despite being assigned different labels[,]" as were the arguments in *Prescott*. 572 S.W.3d at 923.

### CONCLUSION

Following our *de novo* review of Probus's ineffective assistance of Defense counsel claim regarding her investigation and presentation of evidence about an Airsoft weapon, we conclude that Defense counsel's performance was not deficient and did not result in *Strickland* prejudice. Accordingly, we REVERSE the Trial Court's order on this issue and REMAND for additional proceedings on Probus's remaining ineffective assistance of counsel claims.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Daniel Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General
Frankfort, Kentucky

BRIEF FOR APPELLEE:

David L. Stewart
La Grange, Kentucky